UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ROBERT S. JACKSON, ) | |
| ) | |
| Plaintiff, ) | Case No. 3:12-cv-1215 |
| ) | Judge Trauger |
| v. ) | |
| ) | |
| O'REILLY AUTOMOTIVE STORES, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

Pending before the court is a Motion for Summary Judgment filed by the plaintiff (Docket No. 16), to which the defendant has filed a Response in opposition (Docket No. 21), and the plaintiff has filed a Reply (Docket No. 23). For the reasons stated herein, the plaintiff's Motion for Summary Judgment will be denied.

## BACKGROUND

### I. Overview[1]

The plaintiff, Robert Jackson, is a 70-year-old former employee of the defendant, O'Reilly Automotive Stores ("O'Reilly"). Prior to his work at O'Reilly, Jackson drove semi-trailer trucks long distances for Roadway Express for over 28 years. In 1993, while working for Roadway Express, Jackson suffered a heart attack. Following his heart attack, Jackson was

---

[1] Unless otherwise noted, the facts are drawn from the plaintiff's statement of undisputed facts (Docket No. 19), the defendant's responses thereto (Docket No. 22), and the exhibits filed in support of the parties' submissions (Docket No. 18, Exs. 1-14; Docket No. 21, Exs. 1-7).

1

diagnosed with high blood pressure and Type 2 diabetes. He retired from Roadway Express in 2005 after doctors disqualified him from driving semi-trailer trucks due to his blood pressure.

Jackson began working for O'Reilly on April 4, 2008, at a store in Murfreesboro, Tennessee as a part-time Delivery Specialist. At the time he was hired by O'Reilly, Jackson was scheduled to work from 8:00am to 5:00pm. (Docket No. 18, Ex. 1 at 105.) Jackson testified at his deposition that, at the time he was hired, he was able to perform the duties of his job without any accommodation.

Jackson's medical conditions require him to take medication. Jackson testified that he took 27 pills per day during the relevant time period. (Docket No. 18, Ex. 1 at 72.) He takes his pills three times a day: first, around 7:00am when he wakes up; second, around 4:00pm in the afternoon (although his doctor recommends that he take his second round around noon); and third, around bedtime. (*Id.* at 41-45.) Jackson testified that he typically eats food with his pills and, when he does not take his pills on time, he may become groggy. (*Id.* at 44.)

At all relevant times, O'Reilly employed three delivery drivers (including Jackson). At some point in time, Jackson's supervisor, Sean McGinnis, scheduled the drivers to work in a staggered schedule: the first from 7:00am to 4:00pm; the second from 8:00am to 5:00pm, and the third from 9:00am to 6:00pm. Sometime in 2010, McGinnis changed Jackson's hours to 9:00am to 6:00pm. Jackson testified that this change occurred because of a recurring late customer delivery. (Docket No. 18, Ex. 1 at 104, 115.) Jackson typically made between 27 and 30 deliveries per day. (Docket No. 18, Ex. 1 at 66.)

## II. October 18, 2010 Disciplinary Action

On October 18, 2010, Jackson was written up by a supervisor as part of a disciplinary action. According to O'Reilly's corrective action form describing the event, on October 7, 2010,

2

Jackson was scheduled to work until 6:00pm. (Docket No. 18, Ex. 2.) At 5:55pm, a delivery order came in and Jackson refused to take the order.[2] Jackson disputed the details of the write-up at his deposition, testifying that it was "right at 6:00" when he received the order and that he had refused to deliver the order because he was supposed to end his shift. (Docket No. 18, Ex. 1 at 129.) On the disciplinary form, Jackson's supervisor wrote, "This is not the first instance this has happened and is not acceptable." The supervisor further wrote, "We do not stop delivering until there are no deliveries to take." (*Id.*)

At his deposition, Jackson testified that he told his coworker that he would not take the delivery because "[he] was supposed to clock out at 6:00," and he "still got to clean up the back end and lock it up so [he could] leave." (Docket No. 18, Ex. 1 at 131-34.) Jackson further testified that, upon refusing the delivery, he did not tell his coworker that he needed to leave because of his diabetes. (*Id.*) Additionally, Jackson testified that he refused to take the order because it was past his scheduled time to leave work and he "work[s] [his] life in a schedule, and [he] keep[s] it." (Docket No. 18, Ex. 1 at 133.)

III.   <u>Jackson Engages with O'Reilly's Human Resources Department</u>

    **A. Alexis Brown**

Ten days after his supervisor completed the corrective action form, on October 28, 2010, Jackson called Alexis Brown, a human resources employee at O'Reilly. It is undisputed that

---

[2] The parties dispute whether Jackson refused to take the delivery before or after his shift ended at 6:00pm. The record also demonstrates that Jackson's recollections of the event are inconsistent. Jackson testified at his deposition that he was out of the store delivering to a different customer at 5:55pm and, therefore, he did not learn of the 5:55pm order until around 6pm or later. (Docket No. 18, Ex. 1 at 139.) However, Jackson sent a letter to the O'Reilly Human Resources Department on November 15, 2010 recounting the event and stating that he declined the delivery at "5 til six." (Docket No. 18, Ex. 6 at 2.)

Jackson reported to Brown that he is a diabetic and has to eat at certain times. The parties also agree that Jackson reported to Brown that, because he has to eat at specific times, he cannot work past 6:00pm. (*See* Docket No. 18, Ex. 3.) Brown informed Jackson that she would investigate his situation further with the help of Tim Shaw, O'Reilly's Division Human Resources Manager.

### B. Tim Shaw

On October 28, 2010, Shaw contacted Jackson after receiving an email from Alexis Brown. Shaw wrote a report summarizing his conversation with Jackson. (Docket No. 18, Ex. 4.) Shaw wrote:

> When I spoke to Jackson he stated that he had no problem working until 615 PM, but does not want to be forced to work OT [overtime]. He was referring to OT being anytime [sic] after his scheduled shift of 6PM. [Shaw] explained that OT is anything over 40 hrs/wk and he stated that he understood but "does not like eating cold food," and referred to being late for dinner. He brought up diabetes but stated that it (diabetes) was *not* the reason he couldn't work past 6PM. He stated that his reason was that he had a family life.

(*Id.* (emphasis added).) At his deposition, Jackson did not dispute the content of Shaw's report and confirmed that he had stated that his reason for restricting his hours was his family. (Docket No. 18, Ex. 1 at 173.) Jackson further testified that he "tried, like, everything to keep from using diabetes as a crutch." (*Id.*)

### C. Jessica Spurgin

Later on October 28, 2010, Jessica Spurgin, O'Reilly's leave of absence coordinator, called Jackson to discuss his concerns and his medical condition. According to a report drafted by Spurgin on the day of the call, Jackson informed her that he needed to work a certain schedule due to his medication and meal requirements. (Docket No. 18, Ex. 5.) Spurgin replied that O'Reilly would "consider any possible accommodations he might need due to his medical condition," but, first, O'Reilly required medical documentation to show exactly what Jackson's

4

medical needs were. Jackson replied that he would speak to his doctor and see what he could get. Spurgin then informed Jackson that he would not be scheduled to work past 6:00pm until the issue was resolved. Following their conversation, Spurgin sent an email to Billy Lynn, Jackson's direct supervisor, informing him of her request for Jackson's medical documentation and her plan to limit Jackson's schedule until the matter was resolved. (Docket No. 18, Ex. 7.)

At her deposition, Spurgin testified that her decision to limit Jackson's schedule upon learning of his condition was a "temporary accommodation that [she] was making while [Jackson] obtained documentation" from his doctor. (Docket No. 18, Ex. 13 at 51.) Jackson testified that he recalled speaking to Spurgin on October 28, 2010, but did not recall Spurgin requesting medical documentation. (Docket No. 18, Ex 1.) It appears that Jackson did not provide any medical documentation to Spurgin following their call, despite some follow-up conversations.

### D. Jackson's November 15, 2010 Letter

On November 15, 2010, Jackson sent a letter to O'Reilly's human resources department. The letter, in relevant part, discussed his change of shift and hours from 8:00am-5:00pm to 9:00am-6:00pm. Jackson wrote:

> This is part of the confect [sic] I am having with both Jeffery J. Hobbs and Billy Lynn, the D.M. [district manager]. They want me to stay beyond my scheduled time, even if a delivery is called in at five minutes till I am to clock out. I told them that after six is my time and I go home. They said that they will pay me overtime. There is no over time [sic] pay for me because I am not full time and I get less than 40 hours a week. I have my day planned every day I come to work, and don't plan to change at the last minute, because of health.
>
> …
>
> I set my schedule for my medication, and eating to stay alive. That is one reason for not working on any last minute overtime.

5

> …
>
> I know that customers are important to our business. I do what I can to promote our business, in accordance to my work schedule. I commit myself to my job from scheduled time to start, to time to finish, at this time my service to my job is important. After scheduled time, my life is to my commitment to my family, and GOD.

(Docket No. 18, Ex. 6 (emphasis in original).) The letter also explained that, by the end of his workday, Jackson felt exhausted and that it was difficult for him to drive 30 miles home. (*Id.*) At his deposition, Jackson testified that, when he wrote the letter, he was referring to occasions when he sometimes had to take naps on the side of the road during his drive home, and that "every day [he] would take a little cat nap" during slow periods of his shift at O'Reilly. (Docket No. 18, Ex. 1 at 210.)

### IV. The Fitness for Duty Test

On November 29, 2010, Jackson's supervisor, Lynn, emailed Spurgin to inquire if O'Reilly could send Jackson to his doctor in order to have his doctor complete a "fitness for duty" form. According to Spurgin, the fitness for duty form is used by O'Reilly to address an employee's ability to work. (Docket No. 18, Ex. 13 at 17.) Lynn wrote to Spurgin, "The reason I am asking this is because Robert told me that he is taking 27 pills a day, and that sometimes he has to pull over to the side of the road and rest for a few minutes." (Docket No. 18, Ex. 7.) Lynn further wrote, "Also on the day of the store inventory at 981 [Jackson's store] Kenny Criss witnessed Robert taking several pills from an unmarked bottle." (*Id.*) After receiving Lynn's email, on the same day, Spurgin directed Jackson to visit his doctor and requested that his doctor complete a "fitness for duty" form for Jackson.

#### A. The Delivery Specialist Job Description

At the time that she directed Jackson to go to his physician to obtain a completed "fitness for duty" form, Spurgin also instructed that O'Reilly's job description for the Delivery Specialist job (the "Description") be sent to Jackson's physician in connection with his physical exam. (Docket No. 18, Ex. 13 at 25.) The Description lists the essential job functions of the position and includes a chart identifying the general physical requirements of the job in an eight-hour workday. The Description includes a caveat: "This job description indicates the general duties and physical requirements of work performed by team members with this designation. It should not be interpreted as a comprehensive inventory of all duties, responsibilities, qualifications, and physical requirements required of a team member assigned to this job." (Docket No. 18, Ex. 13 at 22-23.) In its "Physical Requirements" section, the Description directs that, in an eight-hour workday, an individual must be able to:

- Stand for 1-2 hours;
- Walk for 1-2 hours;
- Sit for 5-6 hours;
- Bend or stoop for 5-6 hours;
- Reach above shoulder level for 1-2 hours;
- Push or pull for 1-2 hours;
- Squat for 1-2 hours;
- Crouch for 1-2 hours;
- Kneel for 1-2 hours;
- Lift weight of up to 10 lbs for 5-6 hours; 11-25 lbs for 3-4 hours; and 26-60lbs for 1-2 hours; and
- Grasp objects using his hands for 3-4 hours.

(*Id.* at 23.) The requirements further note that the job requires exposure to changes in temperature and humidity, driving automotive equipment and forklifts, and the wearing of personal protective equipment.

**B. Jackson's Fitness for Duty Form**

Jackson's physician, Dr. Chris Beckman, signed Jackson's fitness for duty form on December 16, 2010. (Docket No. 18, Ex. 8.) Dr. Beckman indicated on the form that he would permit Jackson to return to work as of the next day, December 17, 2010, with the permanent restrictions of the maximum number of hours required (in the Description) for all job tasks.[3] (*Id.*) Dr. Beckman directed that Jackson could work for a maximum of 8 hours per day but that, "due to [Jackson's] health and medical conditions, he is not capable of working overtime." (*Id.*)

## V. **Aftermath and Termination**

At some point after she had received Jackson's fitness for duty form, Spurgin contacted district manager Lynn to discuss Jackson. Spurgin testified at her deposition that she contacted Lynn because "the physical requirements in the job description are generic physical restrictions" and "they can vary from store to store," so she needed to contact Lynn to uncover "exactly what Mr. Jackson's needs were and what he needed to be able to do in his position." (Docket No. 18, Ex. 13 at 30.) It appears that, at some point in this conversation, Lynn and Spurgin discussed possible accommodations for Jackson. Lynn told Spurgin that Jackson worked at Lynn's lowest-volume store and was not qualified for any other positions at the store. Lynn and Spurgin also discussed the size of the store, how many deliveries the store makes per day, and the amount of time that delivery drivers stand and walk during their shifts.

---

[3] Specifically, Dr. Beckman prescribed that Jackson could stand for a maximum of 2 hours per day; sit for a maximum of 6 hours per day; kneel or squat for a maximum of 2 hours per day; bend or stoop for a maximum of 6 hours per day; push or pull for a maximum of 2 hours per day; walk for a maximum of 2 hours per day; and grasp or squeeze for a maximum of 4 hours per day. (Docket No. 18, Ex. 8.) These limitations were all as required by the Description. In other words, they were not limitations on his ability to perform the job, as described in the written Description, at all.

8

Based on their phone conversation, Spurgin informed Lynn that O'Reilly would not be able to accommodate Jackson. On January 6, 2011, Spurgin sent a letter to Jackson to inform him that his employment would be terminated. (Docket No. 18, Ex. 9.) The letter stated:

> The essential functions of a Delivery Specialist require frequent standing, walking, kneeling/squatting, and pushing/pulling. It has been determined that you are unable to perform the essential functions of your position with these restrictions. After consulting with operations, it has been determined that you are not qualified for any other positions and you have not identified any other accommodations or alternate positions which would allow you to continue working. As a result, a termination has been processed effective January 5, 2011.

(*Id.*)

## VI. Jackson Files a Complaint with the EEOC

At some point after his termination, Jackson filed a complaint against O'Reilly with the Equal Employment Opportunity Commission ("EEOC"). O'Reilly communicated with the EEOC regarding Jackson's charge. (Docket No. 22 ¶ 51.) After an investigation and attempts at mediation, the EEOC found reasonable cause to believe that violations of the Americans with Disabilities Act ("ADA" or the "Act"), 42 U.S.C. § 12101 *et seq.*, had occurred with respect to some matters in Jackson's charge. (Docket No. 1 at 7.) The EEOC sent Jackson a Right to Sue Notice dated October 2, 2012. (*Id.*)

## VII. The Action

Jackson filed the Complaint against O'Reilly on November 12, 2012, alleging that O'Reilly discriminated against him, retaliated against him, and failed to reasonably accommodate his disability in violation of the ADA (Docket No. 1.) The plaintiff filed his Motion for Summary Judgment on December 15, 2013.

**ANALYSIS**

The plaintiff has filed a motion for summary judgment as to his failure to accommodate claim. In his motion, the plaintiff also refers to a wrongful discharge claim, but both parties fail to substantively address the wrongful discharge claim in their briefs. Accordingly, there is no basis upon which to grant summary judgment on the wrongful discharge claim, and the court limits its analysis to the plaintiff's failure to accommodate claim.

**I.    Summary Judgment Standard**

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson v. Liberty Lobby*, 477 U.S. 242,

249, 252 (1986). An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II. <u>Jackson's Failure to Accommodate Claim</u>

The ADA provides, in pertinent part, that covered entities, including private employers, shall not "discriminate against a qualified individual with a disability." 42 U.S.C. § 12112(a) (2005). The Act defines "discrimination" to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." *Id*. The Act further defines "reasonable accommodation" to include:

> (A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and
> (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

*Id.* § 12111(9).

Jackson premises his claim upon direct evidence. Accordingly, the claim should be analyzed under the following framework:

(1) The plaintiff bears the burden of establishing that he is disabled;

(2) The plaintiff bears the burden of establishing that he is "otherwise qualified" for the position despite his disability;
      a. Without accommodation from the employer;
      b. With an alleged "essential" job requirement eliminated; or
      c. With a proposed reasonable accommodation.

(3) The employer will bear the burden of proving that a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 869 (6th Cir. 2007).

11

O'Reilly does not contest that Jackson is disabled. The parties' dispute centers on (1) whether Jackson is "otherwise qualified" for his position, despite his disability; (2) whether Jackson proposed a reasonable accommodation; and (3) whether O'Reilly engaged in a good faith interactive process to determine if Jackson could be accommodated.

**A. Otherwise Qualified for the Job**

An ADA plaintiff is "otherwise qualified" if he is disabled but, nonetheless, with or without reasonable accommodation, can perform the essential functions of the employment position he holds. A job function is essential if its removal would "fundamentally alter" the position. 29 C.F.R. § 1630.2(n). The central issue here is whether Jackson's physician-ordered limitations—including restrictions to walking, standing, and his ability to work overtime— prohibit Jackson from performing the essential job functions of a Delivery Specialist. Although Jackson relies on the Description to demonstrate that, even with his restrictions, he was fully capable of performing the essential job functions of his position, there is testimony in the record from Jackson's supervisors that the written description is only generic and that the requirements of the Delivery Specialist position exceeded the requirements of the Description and, thereby, the restrictions set by Jackson's physician. (Docket No. 18, Ex. 10 at 30 (Lynn testified that Jackson's standing and overtime restrictions could preclude him from performing his job); Docket No. 18, Ex. 12 at 37 (McGinnis testified that the Delivery Specialist role cannot be limited to set eight-hour shifts because the company must serve its customers before delivery drivers go home).) Indeed, even Jackson himself admitted at his deposition that, "off and on," his position at O'Reilly required him to exceed the physical restrictions set by his physician. (Docket No. 18, Ex. 1 at 255.) Accordingly, two inquiries arise, both of which are disputed by the parties: first, whether working overtime qualifies as an essential function of Jackson's job,

12

and second, whether Jackson could perform the essential functions of his position with or without an accommodation.

The regulations instruct courts to consider a list of factors to determine whether a particular function is essential, including (but not limited to):

(i) The employer's judgment as to which functions are essential;
(ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
(iii) The amount of time spent on the job performing the function;
(iv) The consequences of not requiring the incumbent to perform the function;
(v) The terms of a collective bargaining agreement;
(vi) The work experience of past incumbents in the job; and/or
(vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3). The inquiry into whether a function is essential is highly fact specific. *See Hoskins v. Oakland Cnty. Sheriff's Dep't*, 227 F.3d 719, 226-27 (6th Cir. 2000). Indeed, the Sixth Circuit has noted that "[w]hether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 926 (6th Cir. 2013) (citing *Kiphart v. Saturn Corp.*, 251 F.3d 573, 585 (6th Cir. 2001)).

As evidence of his qualifications for the essential functions of his position, Jackson relies solely upon O'Reilly's written Delivery Specialist job description and testimony from his supervisors that the written description provides a good general description of his role. Jackson argues that, because Jackson could perform the functions listed in the job description, including the physical requirements section, it is undisputed that he could perform the essential functions of the Delivery Specialist job. Jackson further argues that, because working over eight hours a day is not listed in the written description, it cannot be considered an essential function of the Delivery Specialist role.

13

However, the written description is only one factor to be considered. Courts also consider the employer's judgment in ascertaining the essential functions of a job. *Denczak v. Ford Motor Co.*, 215 F. App'x 442, 444 (6th Cir. 2007). Here, the record contains ample testimony from Jackson's supervisor, Lynn, and from Jackson himself, indicating that they considered the Delivery Specialist role to require working more than eight hours per day and walking and standing for more than 2 hours per day. (Docket No. 18, Ex. 1 at 255; Docket No. 18, Ex. 10 at 30-31.)

At this stage, the written job description alone is insufficient to establish the essential functions of the Delivery Specialist role. Moreover, Jackson has failed to demonstrate that there is no genuine issue of material fact as to his ability to perform the essential functions of his job. Consequently, Jackson has failed to demonstrate that he is otherwise qualified to perform his job—an essential element of his claim. Accordingly, he has failed to demonstrate that he is entitled to judgment as a matter of law on his failure to accommodate claim.

**B. The Parties' Additional Arguments**

Because the court has determined that a genuine issue of material fact exists as to whether Jackson is otherwise qualified to perform his job, the court need not address the parties' other arguments, including O'Reilly's assertion that Jackson failed to request a reasonable accommodation and Jackson's assertion that O'Reilly failed to engage in the interactive process related to his requested accommodation. However, even if the court had concluded that no issue of fact exists as to Jackson's ability to perform the essential functions of his job, the court finds that additional genuine issues of material fact exist so as to preclude summary judgment.

    1. <u>Employee's Burden to Propose Reasonable Accommodation</u>

It is well settled that, in ADA cases involving allegations of a failure to accommodate, it is the plaintiff's burden to propose an accommodation that is objectively reasonable. *Keith*, 703 F.3d at 927 (citing *Kleiber*, 485 F.3d at 870). The Sixth Circuit has directed that the employee's initial burden to demonstrate objective reasonableness requires a showing that the accommodation is "reasonable in the sense both of efficacious and of proportional to costs." *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996); *see Keith*, 703 F.3d at 927. Reasonableness of a requested accommodation is generally a question of fact. *Keith*, 703 F.3d at 927.

Jackson argues that, as an accommodation, he requested that he not be required to work past 6:00pm in his initial conversation with Spurgin, and, therefore, that he has demonstrated his initial burden. However, the record is unclear as to both Jackson's request for accommodation and the reasonableness of such a proposed accommodation. First, Jackson fails to present evidence to show that limiting his workday to eight hours is objectively reasonable. Although Spurgin testified that her decision to limit Jackson to eight-hour shifts while he obtained medical documentation for his condition was a temporary accommodation, both testimonial and documentary evidence support O'Reilly's argument that the delivery of parts beyond a scheduled eight-hour shift is an essential part of its retail business. Consequently, Spurgin's temporary accommodation for Jackson may not have been objectively reasonable in the long run. Second, the record is inconsistent as to the intent of, and reason for, Jackson's request for accommodation. Although Jackson submits that he requested an accommodation in his initial conversation with Spurgin and discussed his health, it is undisputed that Jackson told other O'Reilly representatives that he requested to clock out at a scheduled time each day *not* because of his health, but because of his family life. These inconsistencies undermine Jackson's

15

argument that a jury necessarily would find that he proposed a reasonable accommodation under the ADA. Because the parties vigorously dispute whether Jackson proposed an accommodation and whether any proposed accommodation was reasonable, genuine issues of material fact remain that must be addressed by the factfinder.

        2. <u>Failure to Engage in the Interactive Process</u>

Finally, the ADA requires that an employer engage in a mandatory interactive process with a disabled employee, including "communication and good-faith exploration of possible accommodations." *Keith*, 703 F.3d at 929 (internal citations omitted). "The purpose of this process is to identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." *Id.* (citing *Kleiber*, 485 F.3d at 871).

In this circuit, it is settled that a failure to engage in the interactive process is not an independent violation of the ADA. *Id.* The plaintiff must show that a reasonable accommodation was possible and, additionally, that the employer failed to engage in a good faith interactive process and, thereby, failed to accommodate the plaintiff's disability. Here, even if it was undisputed that Jackson was otherwise qualified for his job, Jackson has failed to demonstrate that he proposed an objectively reasonable accommodation. Moreover, the record contains contradictory evidence as to whether O'Reilly engaged in the interactive process with Jackson. Accordingly, even if there was no question of material fact as to Jackson's ability to perform the essential functions of his job, and if it was undisputed that Jackson proposed a reasonable accommodation, O'Reilly's participation in the interactive process remains an issue for the factfinder to determine at trial.

Because of the foregoing, the plaintiff has not met his burden on summary judgment of proving that he is entitled to judgment as a matter of law.

## CONCLUSION

For the reasons stated herein, the plaintiff's motion for summary judgment will be denied.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge